# In the United States Court of Federal Claims

No. 20-1654C
(Filed: February 25, 2022)
**FOR PUBLICATION**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|                                  |     |
|----------------------------------|-----|
| RYAN ALKIRE, *et al.*,           |  \* |
|                                  |  \* |
|     Plaintiffs, |  \* |
|                                  |  \* |
| v.                               |  \* |
|                                  |  \* |
| THE UNITED STATES,               |  \* |
|                                  |  \* |
|     Defendant. |  \* |
|                                  |  \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Molly A. Elkin*, McGillivary Steele Elkin LLP, Washington, D.C., for Plaintiffs. With her on briefs was *Sarah M. Block*, McGillivary Steele Elkin LLP, Washington, D.C.

*Bret R. Vallacher*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for Defendant, United States. With him on briefs were *Brian M. Boynton*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Martin F. Hockey, Jr.*, Acting Director, *Reginald T. Blades, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C, as well as *James Sellars*, Assistant General Counsel, Employment Law Branch, Federal Bureau of Prisons, United States Department of Justice, Atlanta, GA, and *Nathan M. Atkinson*, Assistant General Counsel, Employment Law Branch, Federal Bureau of Prisons, United States Department of Justice, Kansas City, KS.

## OPINION AND ORDER

Plaintiffs — current and former Federal Bureau of Prisons employees at Federal Correctional Institution Herlong ("FCI Herlong," "the Institution," or "the Prison") — seek overtime compensation under the Fair Labor Standards Act ("FLSA"), plus related forms of relief, for allegedly uncompensated pre- and post-shift activities. The government's motion to dismiss is ripe for disposition.[1]

---

[1] Pls.' Compl. (ECF 1) ("Compl."); Def.'s Mot. to Dismiss (ECF 12) ("Def.'s Mot."); Pls.' Opp. to Def.'s Mot. to Dismiss (ECF 13) ("Pls.' Opp."); Def.'s Reply in Supp. of Its Mot. to Dismiss (ECF 14) ("Def.'s Reply"). I heard oral argument on December 21, 2021. Tr. of Oral Arg. (ECF 22).

Although some aspects of the Complaint fail as a matter of law — in particular, Plaintiffs' claims involving time spent in pre-shift security screenings and certain claims over which this Court lacks jurisdiction — the remainder of the Complaint sets out well-pleaded facts sufficient to state claims upon which relief can be granted. *See* RCFC 12(b)(6). The motion is therefore **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

In their Complaint, Plaintiffs request backpay and liquidated damages under FLSA, as well as interest on their backpay under the Back Pay Act, *see* 5 U.S.C. § 5596, and attorneys' fees. Compl. ¶¶ 36–47. The Complaint alleges the following facts.

Plaintiffs are current or former correctional workers at FCI Herlong in Herlong, California. Compl. ¶ 4.[2] FCI Herlong is a medium-security facility housing over 950 male inmates convicted of federal crimes. *Id.* ¶ 8. Plaintiffs, as correctional workers, are charged with maintaining the Prison's safety and security:

> The correctional officers' primary job duty is to maintain the safety and security of the Institution, staff and inmates. They are charged with performing this job duty every moment that they are within the Institution from the moment they begin [security] screening prior to their shifts until they exit the Institution after their shifts end. The plaintiffs perform their primary job duty by, among other things, maintaining constant vigilance to ensure that nothing out of the ordinary is occurring, immediately addressing any safety or security issues that they see no matter the location and time of day that it occurs, including before their paid shifts begin and after they end.

*Id.* ¶ 9.

Plaintiffs' workdays are organized into 8-hour shifts at assigned duty posts. "Most of the posts are staffed for 16 or 24 hours per day, although some are staffed for only 8 hours per day." *Id.* ¶ 10. At the 16- and 24-hour posts, "[t]here is no scheduled overlap" between 8-hour shifts. *Id.* ¶¶ 18–19. Plaintiffs allege that when working shifts at 16- or 24-hour posts, they must "perform work both before their scheduled paid start time and/or after the end of their scheduled paid shifts." *Id.* ¶ 13. Plaintiffs allege that the pre- and post-shift activities are unpaid and take approximately "15-30 minutes each shift, and sometimes more[.]" *Id.* ¶ 14.

---

[2] Some Plaintiffs are "non-custody" workers temporarily assigned to custodial roles, but Plaintiffs allege the difference is not factually material. Compl. ¶¶ 34–35.

The pre- and post-shift activities at issue include (1) pre-shift security screening,[3] (2) donning equipment, (3) clearing the "sally port" and checking into the Prison, (4) walking to the assigned post, (5) obtaining equipment and information from the outgoing officer, and (6) leaving the post at the end of the day. I set out Plaintiffs' principal allegations concerning those activities in turn.

1. *Security Screening*

On arrival at the Prison, Plaintiffs must pass through a screening site in the Prison lobby and participate in a "mandatory staff security screening." *Id.* ¶ 21. Without the screening, "cell phones and other contraband could enter the Institution which would put the staff, inmates and Institution at risk of security breaches." *Id.* Plaintiffs allege that undergoing the security screening is an essential part of their work "because, among other things, in performing this task, plaintiffs ensure that no contraband enters the Institution, thereby ensuring the safety and security of the Institution, staff and inmates." *Id.*

2. *Donning Equipment*

Once through security, Plaintiffs must "collect and don their duty belts and other required equipment …, including required metal chains and chits." *Id.* ¶ 22. The chains are used "to fasten keys"; the chits "contain the names of the officers and are required to access and account for important equipment[.]" *Id.* According to Plaintiffs, collecting and donning the equipment is essential to their work because it allows them to "access necessary equipment" and "ensur[es] that [Plaintiffs'] keys and other equipment can be affixed to their person and secured from the reach of inmates." *Id.* ¶ 23. Plaintiffs allege that they can only don their equipment after the security screening "because the plaintiffs cannot wear their duty belts and metal chains as they walk through the upright metal detector without sounding the alarm." *Id.* ¶ 22.

3. *Clearing the Sally Port*

After donning their equipment, Plaintiffs are "visually identified by the appropriate Control Center officer," "flip their accountability chit" — a personal marker for each employee showing whether the employee is in or out of the Prison — and "clear the front lobby sally port." *Id.* ¶ 26. Plaintiffs then walk to a "locked slider gate," which they pass through to the area where inmates are housed. *Id.* Plaintiffs allege that this process "assur[es] that only authorized individuals enter the secured

---

[3] The Complaint seeks compensation for time in a pre-shift health screening that the Prison has required since the outbreak of the COVID-19 pandemic. Compl. ¶ 24. Plaintiffs have since abandoned that claim. Tr. of Oral Arg. at 58.

confines of the Institution and that the employees in the Control Center and management know exactly who is inside the Institution at all times." *Id.*

### 4. *Proceeding to the Duty Post*

When Plaintiffs reach the secure area, they must stop by the "Lieutenants' office" to "check in with a supervisor and discuss any pertinent information from the previous tour." *Id.* ¶ 27.[4] They may then walk to their posts.

While on the way to their posts, "[P]laintiffs are in uniform and identifiable to the inmates as on-duty correctional officers." *Id.* On their walks, Plaintiffs must "observe and correct inmate behavior, respond to inmate questions, check for security breaches in the perimeter fence and elsewhere in the Institution, check for contraband, run to locations where body alarms sound, and respond to other emergencies as they arise." *Id.* Plaintiffs allege on that basis that they perform their ordinary duties as correctional workers when walking to their posts. *Id.*

### 5. *Equipment and Information Exchange*

Upon arriving at their posts, Plaintiffs exchange information and equipment "including radios, batteries, keys, and OC pepper spray" with the outgoing officer. *Id.* ¶ 28. "The plaintiffs cannot do their jobs without this equipment. ... [T]hey need the radio to communicate with other officers, the lieutenants, and the Control Center concerning important security information and inmate counts. The radio also contains the body alarm which they need to sound ... if there is an emergency." *Id.* The outgoing officer tells the incoming officer about any significant security incidents or concerns from the prior shift, which officers allegedly must know about in order to do their work. *Id.* Although it is not clear whether Plaintiffs intend to pursue the issue, Plaintiffs also allege that they must "don personal protective equipment and sanitize their unit's shared plastic face shield" when they are working "in housing units being used as COVID-19 units" to avoid COVID-19 exposure and transmission. *Id.* ¶ 30.

### 6. *Post-Shift Activities*

Plaintiffs lastly allege that they perform many of the same activities, also without compensation, when their shifts end. Plaintiffs allegedly must "exchang[e] information and equipment on the assigned post with oncoming staff[.]" *Id.* ¶ 31. They must then "remain[] vigilant, alert, and ready to respond to emergencies" while headed back to the exit, "observing and correcting inmate behavior, looking for contraband, [and] responding to body alarms and other emergencies" on the way. *Id.*

---

[4] Plaintiffs also allege that when assigned to 16-hour posts they "must obtain equipment or paperwork from the Control Center." Compl. ¶ 25.

Plaintiffs allege that the post-shift walk involves the same responsibilities as the pre-shift walk. *Id.* ¶¶ 32–33. Plaintiffs then must "return[] equipment to the Control Center" before leaving. *Id.* ¶ 31.

## DISCUSSION

### I. Jurisdiction

The United States Court of Federal Claims has jurisdiction under the Tucker Act to adjudicate "any claim against the United States founded … upon … any Act of Congress or any regulation of an executive department … in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).[5] Because the Tucker Act is "a jurisdictional statute [that] does not create any substantive right enforceable against the United States for money damages," *United States v. Testan*, 424 U.S. 392, 398 (1976) (citing *Eastport S.S. Corp. v. United States*, 178 Ct. Cl. 599, 605–07 (1967)), parties asserting Tucker Act jurisdiction must "identify a substantive right for money damages against the United States, separate from the Tucker Act itself." *Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004). That requires a "money-mandating" source of law, *i.e.*, a statute or regulation that "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained and is reasonably amenable to the reading that it mandates a right of recovery in damages." *Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1307 (Fed. Cir. 2008) (quotes and citations omitted) (quoting *United States v. Mitchell*, 463 U.S. 206, 217 (1983), and *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 473 (2003)).

Plaintiffs' claims for uncompensated work time arise under FLSA, which is a money-mandating source of law. *See Abbey v. United States*, 745 F.3d 1363, 1369 (Fed. Cir. 2014).[6] Because Plaintiffs are government employees seeking backpay and related relief, they have standing to raise those claims. Compl. ¶¶ 1, 45.

"[T]he special statute of limitations governing the Court of Federal Claims requires" that timeliness be considered a jurisdictional question, calling for "*sua sponte* consideration." *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 132 (2008). FLSA claims must be brought within two years of alleged violations, or within

---

[5] Plaintiffs also assert jurisdiction under the "Little Tucker Act," 28 U.S.C. § 1346(a)(2), and FLSA, 29 U.S.C. § 216(b). Compl. ¶ 2. The Little Tucker Act, which grants "district courts … original jurisdiction, concurrent with the United States Court of Federal Claims," over certain lawsuits, *see* 28 U.S.C. § 1346(a)(2), is irrelevant in this case because of the Tucker Act's broader grant of jurisdiction to this Court specifically. FLSA, which authorizes "[a]n action … in any Federal or State court of competent jurisdiction," 29 U.S.C. § 216(b), does not confer jurisdiction on any court at all. *Zumerling v. Devine*, 769 F.2d 745, 749 (Fed. Cir. 1985); *Brooks v. Weinberger*, 637 F. Supp. 22, 23–24 (D.D.C. 1986); *Saleen v. Waste Mgmt., Inc.*, 610 F. Supp. 2d 1026, 1029–30 (D. Minn. 2009).

[6] Jurisdiction over Plaintiffs' allegations related to the Back Pay Act and Declaratory Judgment Act is discussed below.

three years if the violations were willful. 29 U.S.C. § 255(a). Plaintiffs allege continuing willful violations through the day the Complaint was filed, and up to three years before. Compl. ¶¶ 39, 43–44. Some of the Plaintiffs were allegedly employed by the Prison when the Complaint was filed, and so have claims that accrued within the statute of limitations. *Id.* ¶ 4. At least some of Plaintiffs' claims therefore appear to be timely.[7]

## II. Merits

### A. Legal Standards

Under FLSA, employees are entitled to compensation for hours worked, including work "suffer[ed] or permit[ted]" by their employer. 29 U.S.C. §§ 203(g), 207(a)(1); *see also* 5 C.F.R. § 551.401(a). The Portal-to-Portal Act clarifies that compensable hours do not include travel and other "activities which are preliminary to or postliminary to [the employee's] principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities." 29 U.S.C. § 254(a). But if an employee performs his principal activities, including tasks integral and indispensable to his work, before or after his shift — and if the time he spends is more than *de minimis* — compensation is generally required.[8] The question is thus whether Plaintiffs have adequately pleaded that the various ways they allegedly spend time before reaching and after leaving their duty posts are (1) part of their principal activities, and (2) more than *de minimis*.

---

[7] The government has not challenged the individual standing of any Plaintiff or the timing of any individual Plaintiff's claims. Each Plaintiff must, of course, personally establish jurisdiction in order to prevail on the merits. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("[Standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation.").

[8] *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 33 (2014) (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29–30 (2005) (itself quoting *Steiner v. Mitchell*, 350 U.S. 247, 252–53 (1956))); *Bobo v. United States*, 136 F.3d 1465, 1468 (Fed. Cir. 1998); 5 C.F.R. § 551.412(a)(1) (requiring compensation for activities taking more than ten minutes per workday that are "closely related to an employee's principal activities, and … indispensable to the performance of the principal activities"). The regulation, it should be noted, diverges slightly from the Supreme Court's formulation by substituting the phrase "closely related" for "integral." *Compare* 5 C.F.R. § 551.412(a)(1), *with Integrity Staffing*, 574 U.S. at 33. The parties have not suggested that those terms mean different things. Because the "integral and indispensable" test is the Supreme Court's gloss on the Portal-to-Portal Act, the regulation might be in conflict with the statute if it means something different. I will therefore assume that the regulation's standard is identical to what the Supreme Court has derived from the Portal-to-Portal Act.

I consider that question under the familiar standards of RCFC 8 and 12(b)(6), which are modeled on the analogous Federal Rules of Civil Procedure.[9] A complaint in this Court must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" RCFC 8(a)(2). The allegations need not be "detailed," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)), but must be "sufficient …, [when] accepted as true, to 'state a claim to relief that is plausible on its face,'" *id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court considers whether to make that inference in light of "its judicial experience and common sense." *Id.* at 679.

The inference must be stronger than "a sheer possibility that a defendant has acted unlawfully." *Id.* But the inference does not need to be *probable*. Rather, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is *im*probable." *Twombly*, 550 U.S. at 556 (emphasis added). Any facts — as distinct from legal conclusions — pleaded in a complaint must be "accepted as true." *Iqbal*, 556 U.S. at 678. The court "must draw all reasonable inferences in favor of the claimant." *Call Henry, Inc. v. United States*, 855 F.3d 1348, 1354 (Fed. Cir. 2017) (citing *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014)). And "Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (quoted in *Twombly*, 550 U.S. at 556).[10]

## B. Plaintiffs' "Principal Activities"

The first step is to define Plaintiffs' principal activities, as set out in Plaintiffs' factual allegations.[11] Although Defendant objects that Plaintiffs fail to spell out

---

[9] *Kraft, Inc. v. United States*, 85 F.3d 602, 605 n.6 (Fed. Cir.) ("The precedent interpreting the Federal Rules of Civil Procedure applies with equal force to the comparable Rules of the Court of Federal Claims."), *modified on denial of reh'g*, 96 F.3d 1428 (Fed. Cir. 1996).

[10] Plaintiffs, in addition to citing *Twombly* and *Iqbal*, cite an older case for the proposition that "a court 'should not dismiss a complaint for failure to state a claim unless it is *beyond doubt* that the plaintiff can prove *no set of facts* which would entitle him to relief.'" Pls.' Opp. at 10 (quoting *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001)) (emphasis in original); *see also id.* at 24–25 (applying *Sommers Oil*). That is not the correct standard. The language Plaintiffs quote, which originates in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), is "best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563.

[11] What Plaintiffs do during their day is a factual matter, and allegations on the subject are presumed true. The *significance* of what Plaintiffs do — *i.e.*, whether given functions are part of Plaintiffs' principal activities — is a legal question. *See Ballou v. Gen. Elec. Co.*, 433 F.2d 109, 111 (1st Cir. 1970) ("[T]he issue whether or not the classroom program was an 'integral and indispensable part' of

anything beyond the "generalized purpose" of their employment, Def.'s Mot. at 7–9, I conclude that the Complaint contains factual detail sufficient to identify Plaintiffs' principal activities. That makes it possible to determine whether Plaintiffs have adequately pleaded that the pre- and post-shift tasks at issue are part of those activities.

Plaintiffs, again, are entitled to compensation for their principal activities, a term that includes the work they are "employed to perform," 29 U.S.C. § 254(a)(1), plus "all activities which are an 'integral and indispensable part of the principal activities.'" *Integrity Staffing*, 574 U.S. at 33 (quoting *IBP*, 546 U.S. at 29–30). An activity is integral and indispensable to the employee's principal activities — and thus *part* of the principal activities, *see IBP*, 546 U.S. at 33 — "if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Integrity Staffing*, 574 U.S. at 33. To meet that test, it is not enough that a given activity is required by the employer or done for the employer's benefit. *Id.* at 36. Rather, the question is whether the activities are "tied to" — that is, integral and indispensable to — "the productive work that the employee is *employed to perform*." *Id.*

A few examples illustrate the "integral and indispensable" test. On the one hand, time meatpackers spend on knife-sharpening is integral and indispensable to their work, because without it they could not cut meat safely and efficiently. *Id.* at 34 (citing *Mitchell v. King Packing Co.*, 350 U.S. 260, 262 (1956)). Time battery plant employees spend "showering and changing clothes" to protect themselves against chemicals that are "toxic to human beings" is integral and indispensable to their work as well: Poisoned employees cannot do their jobs. *Id.* (quoting *Steiner*, 350 U.S. at 249). On the other hand, time spent *waiting* to don protective gear is "two steps removed from the productive activity," and therefore not integral and indispensable. *IBP*, 546 U.S. at 42. Most relevant to this case, the Supreme Court has also excluded time warehouse employees spend being screened for theft after their shifts: The employees' principal activity was not "to undergo security screenings, but to retrieve products from warehouse shelves and package those products for shipment," and

---

appellants' principal activity is not, as appellants suggest, a factual one. It is a question of law."); *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 910 (9th Cir. 2004) ("The nature of the employees' duties is a question of fact, and the application of the FLSA to those duties is a question of law.") (citing *Baker v. Barnard Const. Co.*, 146 F.3d 1214, 1216 (10th Cir. 1998)); *Anderson v. Perdue Farms, Inc.*, 604 F. Supp. 2d 1339, 1349 (M.D. Al. 2009) ("Whether a particular activity is integral and indispensable under the FLSA is a question of law[.]") (citing *Birdwell v. City of Gadsden*, 970 F.2d 802, 807 (11th Cir. 1992)); *Brantley v. Ferrell Elec., Inc.*, 112 F. Supp. 3d 1348, 1371 (S.D. Ga. 2015) (citing *Anderson*, 604 F. Supp. 2d at 1349). No presumption of truth applies to Plaintiffs' legal positions, *Iqbal*, 556 U.S. at 678, even when "couched as" allegations of fact. *Kam-Almaz v. United States*, 682 F.3d 1364, 1368 (Fed. Cir. 2012) (quoting *Twombly*, 550 U.S. at 555).

"[t]he security screenings … were not 'integral and indispensable' to the employees' duties[.]" *Integrity Staffing*, 574 U.S. at 35.

Here, Plaintiffs allege that their principal activity is "to maintain the safety and security of the Institution, staff and inmates." Compl. ¶ 9. That activity allegedly entails functions such as "maintaining constant vigilance to ensure that nothing out of the ordinary is occurring, immediately addressing any safety or security issues that they see no matter the location and time of day that it occurs," *id.*, "assuring that no contraband enters the Institution," *id.* ¶ 21, "removing contraband from the Institution," *id.* ¶ 27, "observ[ing] and correct[ing] inmate behavior, respond[ing] to inmate questions, check[ing] for security breaches in the perimeter fence and elsewhere in the Institution, check[ing] for contraband, run[ning] to locations where body alarms sound, and respond[ing] to other emergencies as they arise," *id.* The Complaint alludes to other job functions as well. That Plaintiffs' principal activities involve those responsibilities is a factual allegation entitled to the presumption of truth.

Defendant argues that maintaining safety and security is not a "specific activit[y]," but rather the "general purpose" of Plaintiffs' employment, and therefore not a "principal activity" as the Supreme Court has defined the term. Def.'s Mot. at 7–8. And Defendant is correct that Plaintiffs' principal activities must be determined mainly with reference to the productive acts Plaintiffs perform as part of their workday, not the employer's purposes or needs. *Integrity Staffing*, 574 U.S. at 35–36. But contrary to Defendant's argument, "maintain[ing] … safety and security" can readily be interpreted as an activity (or collection of activities), not just as a "purpose." As should be evident from the non-exhaustive examples in the preceding paragraph, Plaintiffs have identified many specific functions that are part of maintaining safety and security. Plaintiffs' allegations must, of course, be interpreted in their favor. *E.g.*, *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009).

Given the detail in Plaintiffs' Complaint, there is no reason to penalize Plaintiffs for using a general catch-all as shorthand for the variety of activities they mention. To the extent *Integrity Staffing* requires me to do so, I interpret Plaintiffs' references to maintaining Prison security as allegations about their activities rather than their employer's goals or purposes. I accordingly conclude that Plaintiffs have adequately identified their principal activities.

## C. FLSA Claim

Given that the Complaint adequately defines Plaintiffs' principal activities, the next question is whether it permits a reasonable inference that the allegedly uncompensated functions at issue are part of those activities and more than *de*

*minimis. Abbey v. United States*, 99 Fed. Cl. 430, 436 (2011). I consider the job functions one at a time.

1. *Security Screening*

The first activity at issue is the security screening Plaintiffs undergo when they arrive at work.[12] Although the issue is complicated, I conclude that they have not stated a plausible claim for compensation for that time.

The security screenings are not the "principal activity or activities which [Plaintiffs are] employed to perform." 29 U.S.C. § 254(a)(1).  Much like the employees in *Integrity Staffing*, Plaintiffs are not "employ[ed] … to undergo security screenings," but to maintain security once inside the Prison. 574 U.S. at 35. There is nothing "productive" about the security screenings. *Id.* at 36.

Nor are security screenings integral or indispensable to Plaintiffs' work, as the Supreme Court has defined the Portal-to-Portal Act standard.[13] One consequence of the Portal-to-Portal Act is to separate "activities that are essentially part of the ingress and egress process" from "activities that constitute the actual 'work of consequence performed for an employer[.]'" *Integrity Staffing*, 574 U.S. at 38 (Sotomayor, J., concurring) (quoting 29 C.F.R. § 790.8(a)). Pre-shift security screenings, like post-shift screenings for employee theft and other arrival and departure processes, "fall on the 'preliminary or postliminary' side of this line." *Id.* at 38–39 (alteration omitted).

The Complaint gives no basis for a plausible inference that a security screening is an "intrinsic element" of maintaining security inside the Prison any more than the screening in *Integrity Staffing* was an intrinsic element of handling products inside a warehouse. *Removing* contraband is allegedly one of Plaintiffs' regular daily activities, *see* Compl. ¶ 27; Tr. of Oral Arg. at 53, and *excluding* contraband is allegedly "a chief objective" of the Prison, Pls.' Opp. at 7. Plaintiffs also allege that "assuring that no contraband enters the Institution" is a "primary duty" of Prison employees. Compl. ¶ 21. I understand that to mean employees are personally responsible for not bringing contraband into the Prison, and Prison guards screen visitors and employees for contraband on arrival. I take those allegations as true, as I must. But it does not follow that *being screened* to ensure compliance with contraband rules is an intrinsic part of Plaintiffs' job.

---

[12] Plaintiffs have abandoned their claim for compensation for COVID-19 screening. Tr. of Oral Arg. at 58.

[13] "As explained above, an activity is not integral and indispensable to an employee's principal activities unless it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform those activities." *Integrity Staffing*, 574 U.S. at 35.

On the contrary: Just as a theft screening is "not an intrinsic element of retrieving products from warehouse shelves or packaging them for shipment," *Integrity Staffing*, 574 U.S. at 35, Plaintiffs can remove contraband from the Prison, screen others for contraband, and refrain from bringing contraband in even if they themselves are not screened. The acts are distinct in every way. They are certainly not related in the way that sharpening a knife is connected with cutting meat, or that wearing protective gear is connected with handling dangerous chemicals. *Steiner*, 350 U.S. at 249–50; *King Packing*, 350 U.S. at 262. The screening — like other kinds of waiting time before or after shifts — is therefore "two steps removed" from the activities the employees are employed to perform. *IBP*, 546 U.S. at 42. That means the work and the screening are not "intrinsic" to each other. *See Integrity Staffing*, 574 U.S. at 38 (Sotomayor, J., concurring) (observing that screenings were not principal activities even though they "in some way related to the work that the employees performed").

For similar reasons, Plaintiffs' screenings are not "indispensable" to their work because they are not activities "with which the employee cannot dispense if he is to perform those activities." *Id.* at 35 (majority opinion). Plaintiffs emphasize the importance of preventing contraband from entering the Prison and argue on that basis that contraband screenings are part of their principal activities. Compl. ¶ 21; Tr. of Oral Arg. at 53–54. But even taking that allegation as true, it is not the *screening* that makes it possible for Plaintiffs to do their jobs, but following Prison rules that forbid contraband.

Suppose two Prison employees came to work at the same duty post on the same day, neither one carrying contraband. Even if one was screened and the other was not, nothing in the Complaint suggests they could not perform their own duties equally well. Or suppose two hypothetical prisons, one of which screened all its employees and one of which did not. The safety and effectiveness of the employees inside the prison would depend on whether they introduced contraband, not on whether they were screened. Precisely the same was true in *Integrity Staffing*: Assuming warehouse employees refrained from stealing, whether they were screened or not at the end of their shifts makes no difference in whether they could do their jobs. The only inference is that like in *Integrity Staffing*, the Prison "could have eliminated the screenings altogether without impairing the employees' ability to complete their work." 574 U.S. at 35.[14]

---

[14] That also distinguishes this case from *King Packing* and *Steiner*. A meatpacker can cut meat if he sharpens his knives, but not if he fails to do so. *King Packing*, 350 U.S. at 262 ("[A] knife to be of any practical value in a knife job has to be sharp.") (quotes and alteration omitted). A battery plant employee can work if he wears protective clothing, but not if he is poisoned by lead and burned by

There is no interpretation of Plaintiffs' pleadings that avoids *Integrity Staffing*. One way to construe Plaintiffs' allegations is that a Prison employee *who introduces contraband into the Prison* cannot safely do his job. Or perhaps Plaintiffs mean that an employee cannot do his job if *other* employees have introduced contraband. Either way, I take the allegation as true. But it is equally obvious that the employees in *Integrity Staffing* could not have done their work of "retrieving products from warehouse shelves or packaging them for shipment" if they (or their colleagues) were stealing the products instead. *Id.* at 35. If that were enough to render a screening indispensable, *Integrity Staffing* would have allowed the employees' claims to proceed.

Yet another construction of the Complaint is that excluding contraband is essential to Prison management, and that doing so is impossible unless Plaintiffs are not only prohibited from bringing contraband but screened at entry. I take that allegation as true too. But even then, it is still irrelevant to the *Integrity Staffing* test, which focuses solely on indispensability to "*the employee.*" 574 U.S. at 35 (emphasis added). A warehouse, after all, could not function if its employees walked off with the merchandise. That is presumably why the employer in *Integrity Staffing* required post-shift screening. Just so here: The *Prison* may not be able to dispense with screenings — as opposed to only a written policy on contraband — but nothing in the Complaint suggests that *Plaintiffs* cannot.

What *Integrity Staffing* suggests, in other words, is a distinction between an employee's principal activities, the rules the employee must follow at work, and the processes the employer puts in place to enforce compliance with the rules — particularly at ingress and egress.[15] An employee might have to follow a rule at work, and the compliance measures might be required by the employer, *see Integrity Staffing*, 574 U.S. at 36, but it does not follow that the measures are indispensable to

---

sulphuric acid. *Steiner*, 350 U.S. at 249–50. In both cases, the specific use of time at issue was what made the work possible.

[15] *See Sanford v. Preferred Staffing Inc.*, 447 F. Supp. 3d 752, 756 (E.D. Wis. 2020) ("Plaintiffs contend that the preliminary processes required by the Staffing Defendants are indeed integral to the principal activities they were hired to perform. ... Plaintiffs' view again conflates the requirements an employer imposes upon its employees with the actual work the employees are meant to perform."); *Dinkel v. MedStar Health Inc.*, 99 F. Supp. 3d 37, 40 (D.D.C. 2015) ("Plaintiffs argue that they have established that the Class members' uniform maintenance activities were part of their principal work duties because their job descriptions required compliance with Defendants' dress and appearance, patient safety and inflectional control policies. ... However, a requirement to comply with these several policies is not enough to establish uniform maintenance as a principal work activity. An activity is only compensable as a principal activity if the employee is 'employed to perform' that activity.") (quotes and citation omitted) (quoting *Integrity Staffing*, 574 U.S. at 34).

the employee's principal activities. Once again, compliance measures are "two steps removed" from the work. *IBP*, 546 U.S. at 42.

The foregoing interpretation of *Integrity Staffing* tallies with the Court's reliance on a Department of Labor ("DOL") opinion letter concluding that a pre-shift search at a rocket-powder plant for "matches, spark producing devices such as cigarette lighters, and other items which have a direct bearing on the safety of the employees" was not compensable. *See Integrity Staffing*, 574 U.S. at 35–36 (citing Opinion Letter from Dept. of Labor, Wage and Hour Div., to Dept. of Army, Office of Chief of Ordnance (Apr. 18, 1951), pp. 1–2). If a pre-shift search for prohibited fire-starters at an explosives factory is not integral or indispensable to those employees' principal activities, it is hard to imagine why a search for contraband at a prison would be: Both searches are directed at excluding items that would be dangerous in the workplace.

It also tallies with the bulk of authority holding as a matter of law (either at the pleadings or at summary judgment) that pre-shift security screenings generally are not compensable. *Gorman v. Consolidated Edison Corp.*, 488 F.3d 586, 592–93 (2d. Cir. 2007) (pleadings); *Bonilla v. Baker Concrete Construction, Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007) (summary judgment); *Whalen*, 93 Fed. Cl. 579, 600 (2010) (summary judgment); *Henderson v. Cuyahoga Cty.*, No. 1:20-CV-1351, 2020 WL 5706415, at *3 (N.D. Ohio Sept. 24, 2020) (pleadings); *Cinadr v. KBR, Inc.*, No. 3:11-CV-00010, 2013 WL 12097950, at *7 (S.D. Iowa Feb. 15, 2013) (summary judgment); *Ceja-Corona v. CVS Pharmacy, Inc.*, No. 1:12-CV-01868, 2013 WL 796649, at *9 (E.D. Cal. Mar. 4, 2013) (pleadings), *on reconsideration in part*, No. 1:12-CV-01868, 2013 WL 3282974 (E.D. Cal. July 2, 2013); *Jones v. Best Buy Co.*, No. CV-12-95, 2012 WL 13054831, at *2–3 (D. Minn. Apr. 12, 2012) (pleadings); *Phillips v. Washington Grp. Int'l, Inc.*, No. 1:09-CV-00431, 2010 WL 11561237, at *5 (N.D. Ala. Sept. 29, 2010) (summary judgment); *Anderson*, 604 F. Supp. 2d at 1359 (summary judgment); *Sleiman v. DHL Express*, No. CIV.A. 09-0414, 2009 WL 1152187, at *4–5 (E.D. Pa. Apr. 27, 2009) (pleadings); *but see Fritz v. Corizon Health, Inc.*, No. 6:19-CV-03365, 2020 WL 9215899, at *9 (W.D. Mo. Jan. 31, 2020) (declining to dismiss claims involving security screening for state prison nurses).

Plaintiffs' principal contrary authority, *Aguilar v. Management & Training Corp.*, is against the weight of caselaw.[16] 948 F.3d 1270 (10th Cir. 2020). It is also

---

[16] Plaintiffs have also submitted, as supplemental authority, four recent decisions by this Court denying motions to dismiss similar complaints. Pls.' Notice of Suppl. Authority (ECF 17) (*Adegbite v. United States*, No. 20-1183C, 2021 WL 5045268 (Fed. Cl. Oct. 29, 2021), and *Alexander v. United States*, No. 21-1143C, 2021 WL 5045270 (Fed. Cl. Oct. 30, 2021)); Pls.' Notice of Suppl. Authority (ECF 20) (*Alvarez v. United States*, No. 20-1533C, 2021 WL 6163405 (Fed. Cl. Dec. 30, 2021), and *Adair v.*

wrongly decided. In that case, the Tenth Circuit held that a pre-shift security screening for prison employees was part of the employees' principal activities because "the security screening and the officers' work share the same purpose" and because the screening was "tied to" the employees' work. *Id.* at 1278 (quoting *Integrity Staffing*, 574 U.S. at 36).

That test is incorrect. The question is not whether pre-shift activities align with the "purpose" of employment. If it were, then virtually every pre- and post-shift activity required by an employer would be compensable. Why would an employer mandate a given activity in the first place if not to further the "purpose" of employment? *Integrity Staffing* rejects that very approach: "If the test could be satisfied merely by the fact that an employer required an activity, it would sweep into 'principal activities' the very activities that the Portal–to–Portal Act was designed to address." 574 U.S. at 36.[17]

Nor is it enough for an activity to be "tied to" the employee's work. *Aguilar*, 948 F.3d at 1278. The Tenth Circuit took that test from *Integrity Staffing*'s reference to activities "tied to the productive work that the employee is employed to perform." 574 U.S. at 36. But it appears to have read the *Integrity Staffing* Court's language in isolation, not in the context of a detailed explanation of what it *means* for pre- or post-shift activity to be part of the employee's principal activities. Far from merely directing lower courts to analyze in the abstract whether an activity is "tied to" an employee's principal activities, the Court requires analyzing whether the activity is integral and indispensable — a more focused analysis, rooted in the words of the Portal-to-Portal Act. The Supreme Court's reasoning precludes the vague, atextual search for relatedness that the *Aguilar* court used. *See Integrity Staffing*, 574 U.S. at 33; *see also id.* at 38 (Sotomayor, J., concurring).

By asking the wrong questions, the *Aguilar* court reached the wrong answers. The Tenth Circuit held that the screenings were "'an intrinsic element of' the officers' security work" because "the security screening and the officers' work share the same goal," *Aguilar*, 948 F.3d at 1279 (quoting *Integrity Staffing*, 574 U.S. at 33) — a

---

*United States*, No. 20-1148C, 2021 WL 6163407 (Fed. Cl. Dec. 30, 2021)). Although I generally agree with those decisions, I respectfully part from my learned colleagues on the issue of security screenings.
[17] That does not necessarily mean I must *ignore* the purpose of employment. *See* Pls.' Opp. at 18. Identifying an employee's "principal activities" and their relationship to other activities presumably entails understanding what ends his employment is supposed to serve — much like interpreting statutory terms might depend on knowing the statute's subject matter or the problem the statute is supposed to solve. *Cf.* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 20 (2012); Samuel L. Bray, *The Mischief Rule*, 109 Geo. L.J. 967 (2021). The employer's purpose, however, is not an analytical substitute for the employee's actual work tasks any more than a statute's purpose displaces its text.

mistaken test that conflates the employer's purposes with the employee's principal activities. The court also concluded that the screenings were "indispensable" because "an officer cannot safely and effectively maintain custody and discipline of inmates and provide security while also bringing weapons or contraband into the prison," *id.* (quotes and alterations omitted) — which, as explained above, confuses the employer's requirements for the employee with the compliance measures the employer chooses to implement.

Plaintiffs' last defense of *Aguilar* is that there is something unique about the security of prisons that justifies a special rule. Tr. of Oral Arg. at 56–58. But that is no more than special pleading, unrooted in case authority or statutory text. It also conflicts with the many cases involving other sensitive locations where security screening time has not been compensable. *See Whalen*, 93 Fed. Cl. at 600 (air traffic control tower); *Gorman*, 488 F.3d at 592–93 (nuclear power plant); *see also Integrity Staffing*, 574 U.S. at 35 (discussing DOL letter involving pre-shift screenings at a rocket-powder plant).[18] The cases do not permit an arbitrary carve-out for Plaintiffs' work environment. I therefore cannot follow the Tenth Circuit's reasoning or agree with its result.

Ordinarily, even weak claims should be tested through discovery if they meet pleading standards. *See, e.g.*, *Twombly*, 550 U.S. at 556 ("[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.") (quotes omitted); *Huon v. Denton*, 841 F.3d 733, 742 (7th Cir. 2016). But *Integrity Staffing* itself was decided on a motion to dismiss — indeed, it overturned a Ninth Circuit decision reversing the district court's grant of dismissal. 574 U.S. at 37; *Busk v. Integrity Staffing Solutions, Inc.*, 713 F.3d 525, 530–31 (9th Cir. 2013). It therefore follows that the relationship between screenings and an employee's principal activities is best determined as a matter of law when the pleadings allow. In this case, there are no facts consistent with the pleadings that Plaintiffs might adduce to show that

---

[18] The *Aguilar* court distinguished the DOL letter, relied on in *Integrity Staffing*, that decided against compensability for pre-shift safety screening at the rocket-powder plant. The basis for the distinction appears to be that while there is no "clear or obvious connection" between a screening for fire-starters and "the particular activities … employees [were] employed to perform" at the rocket-powder plant, there *is* such a connection between screening for contraband at a prison and the activities of prison employees. 948 F.3d at 1278. That is a stretch at best. Although the *Integrity Staffing* Court did not "clearly outline[] the principal activities of the employees at the rocket-powder plant," *id.*, a faithful reading of the opinion should not place much weight on the Court leaving it implicit that fire-starters could lead to explosions that plant employees are presumably responsible for avoiding. The fact that the Supreme Court analogized so readily from the rocket-powder plant to the warehouse — where the Court *did* define employees' principal activities, *see* 574 U.S. at 35 — suggests that the kind of detail the Tenth Circuit apparently expected was unnecessary for the Supreme Court's reasoning.

undergoing screening is part of their productive work, or that screening itself is integral and indispensable to that work. *See Twombly*, 550 U.S. at 563. Even if Plaintiffs proved that excluding contraband is essential to Prison administration and that they cannot do their jobs if contraband were inside, we would end up right back where we are, asking whether time spent in screenings is integral and indispensable to Plaintiffs' work — a *legal* question which must be answered in the negative. *See Rowe v. United States*, 151 Fed. Cl. 268, 271 (2020) ("It is well-settled that a complaint should be dismissed under RCFC 12(b)(6) 'when the facts asserted by the claimant do not entitle him to a legal remedy.'") (quoting *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)).

### 2. *Donning Equipment*

The second activity at issue, which Plaintiffs allege they perform as soon as they pass through security, Compl. ¶ 22, is donning a security belt and other gear. I conclude that Plaintiffs have stated a claim for relief for that time.

Defendant concedes that donning specialized items necessary to job functions is generally part of an employee's principal activities. Tr. of Oral Arg. at 22. That is a correct reading of the many cases involving protective gear and similar items. *See, e.g.*, *IBP*, 546 U.S. at 40; *Perez v. Mountaire Farms*, 650 F.3d 350, 366–67 (4th Cir. 2011); *compare Steiner*, 350 U.S. at 248, 256. Defendant also concedes that at least some of the items Plaintiffs allegedly must don for their jobs fall into that category. Tr. of Oral Arg. at 25–26. That appears consistent with the allegations in the Complaint, Compl. ¶¶ 22–23, which must be taken as true.

Defendant's argument, rather, is that the Complaint leaves doubt about what items Plaintiffs don, where the items are donned, why they are donned where they are, and how much time donning takes. For example, Defendant argues that the time spent donning a belt, chains, and chits immediately inside security is *de minimis* — and therefore not substantial enough either to be compensable or to trigger the beginning of Plaintiffs' workday. Def.'s Mot. at 15 n.4; Def.'s Reply at 18; *see Singh v. City of New York*, 524 F.3d 361, 371 n.8 (2d Cir. 2008); *but see Butler v. DirectSAT USA, LLC*, 55 F. Supp. 3d 793, 817 (D. Md. 2014). Defendant also objects that Plaintiffs have not adequately pleaded why they must don their gear inside security and not elsewhere. Tr. of Oral Arg. at 23–25. Assuming that an employee's first principal activity starts his workday, *see* 29 U.S.C. § 254(a) — the argument goes — it might not be correct that Plaintiffs' compensable time begins immediately after the security screening. Tr. of Oral Arg. at 24–25.

Those may be reasonable arguments, but they are not appropriate for the pleadings stage. For purposes of a motion to dismiss, I must assume the truth of

Plaintiffs' well-pleaded facts and permit Plaintiffs to proceed if a reasonable inference of liability arises. *Iqbal*, 556 U.S. at 678; *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327–28 (Fed. Cir. 2006). The pleadings suggest a reasonable inference that donning equipment is one of Plaintiffs' principal activities, and that Plaintiffs must perform that task immediately after the security screening. Compl. ¶¶ 22–23. As for how long donning takes, the parties disagree on the exact test for determining whether time is *de minimis*. Pls.' Opp. at 27–30; Def.'s Reply at 17–20. But whatever the proper test is, applying it will depend on facts, and there is no good way to resolve the abstract legal dispute without those facts. Similarly — because, as discussed below, I cannot dismiss Plaintiffs' claims as to any activities that follow donning — it does not matter at this stage whether the donning time itself is *de minimis*. Whether and how to aggregate time spent on different activities, some of which may be *de minimis*, is now only a hypothetical inquiry that should await factual development on the merits.

### 3. *Clearing the Sally Port*

The third activity at issue is clearing the sally port at the beginning of the day. Although Plaintiffs' claims appear questionable, I cannot dismiss them at this stage.

Plaintiffs do not disagree that checking in and waiting to check in are ordinarily noncompensable preliminary and postliminary time, nor that clearing the sally port fits within that definition. Tr. of Oral Arg. at 59, 63–64; *see Integrity Staffing*, 574 U.S. at 34 (citing DOL regulations); *id.* at 39 (Sotomayor, J., concurring) (reasoning that "checking in and out and waiting in line to do so" are "activities that Congress clearly deemed to be preliminary or postliminary"). Instead, Plaintiffs contend that because clearing the sally port occurs after Plaintiffs' first principal activity of the day, it is compensable under the "continuous workday rule." Tr. of Oral Arg. at 59. The continuous workday rule, Plaintiffs argue, "requires compensation from the moment an employee performs their first principal activity of the day until they finish performing their last principal activity of the day," even when some intervening activities are not otherwise compensable. Pls.' Opp. at 5 (citing *Perez*, 650 F.3d at 373, and 29 C.F.R. § 790.6); *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 226 (2014). As just noted, Plaintiffs have adequately pleaded that the first principal activity of the workday is donning their equipment, so if the continuous workday applies, clearing the sally port could be compensable time.

There are still several hurdles Plaintiffs must clear in order to prevail on that theory. One is authority explaining that for the continuous workday rule to come into play, the initial principal activity must be more than *de minimis*. *Singh*, 524 F.3d at 371 n.8; *but see Butler*, 55 F. Supp. 3d at 817. Especially after dismissal of Plaintiffs'

claims regarding security screening, it seems doubtful that donning gear inside security meets that threshold. But that, as explained previously, is a factual dispute I cannot resolve on the pleadings. *See Twombly*, 550 U.S. at 556.

Another hurdle is that, as I have held elsewhere, the continuous workday rule does not apply to federal employees in the same way that it applies to other workers. *See Bridges v. United States*, 156 Fed. Cl. 129, 134 (2021), *appeal filed*, No. 22-1140 (Fed. Cir.). Plaintiffs' understanding of the continuous workday rule derives from FLSA regulations promulgated by DOL. *See* Pls.' Opp. at 16 (citing 29 C.F.R. § 790.6); *id.* at 30 (same). But it is the Office of Personnel Management ("OPM"), not DOL, that administers FLSA for federal employees. *See* 29 U.S.C. § 204(f); *see also* 5 C.F.R. §§ 551.102, 551.103. OPM regulations, contrary to Plaintiffs' position, "exclude[]" preliminary and postliminary activity from compensable hours of work "even if it occurs between periods of activity that are compensable as hours of work." 5 C.F.R. § 551.412(b). If that regulation applies according to its terms, time clearing the sally port might be excluded from compensation even if it follows a compensable principal activity.

Nonetheless, I cannot dismiss for those reasons either. Defendant has not moved to dismiss based on the OPM regulations, and it is possible that the relevant OPM regulations would apply here differently from how they applied to the travel and shift-scheduling at issue in *Bridges*. If the government did move to dismiss on that basis, Plaintiff would have the opportunity to challenge the OPM regulations as inconsistent with DOL regulations. *See Billings v. United States*, 322 F.3d 1328, 1333–34 (Fed. Cir. 2003); *see also Am. Fed'n of Gov't Employees v. Office of Pers. Mgmt.*, 821 F.2d 761, 770 (D.C. Cir. 1987); *Plaintiff No. 1 v. United States*, 154 Fed. Cl. 95 (2021). Because resolving these issues without further legal and factual development would be premature, Plaintiffs may develop their claims on the merits.

4. *Proceeding to and from the Duty Post*

The next segment of Plaintiffs' claims involves the time they spend walking from the sally port to their duty stations, and then back to the sally port at the end of the day. Plaintiffs have stated a plausible claim for relief as to that time.

Simply walking from a check-in location to a workstation is expressly excluded from compensation under the Portal-to-Portal Act. 29 U.S.C. § 254(a)(1); *IBP*, 546 U.S. at 40–41. But Plaintiffs allege that when they walk from the sally port to their duty stations, they are not just covering distance, but correcting inmate behavior, responding to inmate requests, looking for security breaches, handling emergencies, and so forth. Compl. ¶ 27. If those allegations are true — and they must be taken as

- 18 -

true — it is plausible that Plaintiffs perform some of their principal activities while walking.

Defendant responds that not *all* the time spent walking to duty stations involves such work, arguing that Plaintiffs are merely called upon to exercise vigilance while walking and that Plaintiffs could seek overtime compensation for any work they must do on their way to and from duty posts. Def.'s Mot. at 19–21; Tr. of Oral Arg. at 28–30. Some cases have held that no compensation is required for time when off-duty employees need to be on call or generally vigilant. *See, e.g.*, *Akpeneye v. United States*, 990 F.3d 1373, 1383–85 (Fed. Cir. 2021). The Eleventh Circuit, moreover, has held that time police officers spend commuting in marked police vehicles is noncompensable even if they have to respond to "accidents, disabled vehicles, flagrant safety violations, or even routine traffic violations" on the way. *Llorca v. Sheriff, Collier Cty., Fla.*, 893 F.3d 1319, 1327 (11th Cir. 2018). But time on "standby status" can be compensable work, *see, e.g.*, *Akpeneye*, 990 F.3d at 1383 (citing *Armour & Co. v. Wantock*, 323 U.S. 126 (1944), and *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)), and of course compensable work can involve walking from place to place.

Questions about what Plaintiffs actually must do on their walks are fact-dependent, hard to consider in the abstract, and therefore unsuitable for resolution on the pleadings. *See Cheung v. United States*, No. 18-48C, 2021 WL 5810472, at *23 (Fed. Cl. Aug. 27, 2021) (explaining that disputes over "whether an employee is in on-call or on standby duty status are questions of fact"). It is not evident from the Complaint that during their walks Plaintiffs are merely off-duty employees exercising vigilance, as opposed to *on*-duty employees who happen to be walking. As for the *amount* of the walk Plaintiffs spend performing their principal activities, even if the entire walk is not compensable, that might only go to quantification of Plaintiffs' unpaid time, not to whether they have stated a claim. *See Reich v. New York City Transit Auth.*, 45 F.3d 646, 648, 651–52 (2d Cir. 1995) (rejecting employer's argument "that the travel exemption immunizes it from liability for any tasks imposed on [employees] to be performed during the commute" but disagreeing with DOL's argument that "the [employees'] entire commute should be compensated").

Plaintiffs also allege that they "discuss any pertinent information" with a supervisor in the Lieutenant's office before proceeding to their shift. Compl. ¶ 27. Defendant characterizes that interaction as part of "checking into and out of the workplace." Def.'s Mot. at 19. Perhaps so. But it is also reasonable to infer that obtaining information from other officers is integral and indispensable to Plaintiffs' security functions, as the Supreme Court has defined that test. The facts alleged in the Complaint and the parties' legal arguments do not permit resolution of the issue

- 19 -

against Plaintiffs on the pleadings. Even Defendant appears to acknowledge as much. Tr. of Oral Arg. at 34. The exact nature of the Lieutenant's office meeting, and its importance to Plaintiffs' principal activities, is thus a factual question to be explored on the merits as well.

### 5. *Equipment and Information Exchanges*

Finally, Plaintiffs allege that they should be paid for time spent exchanging equipment and information with the outgoing duty officer when arriving at a duty station, and with the incoming duty officer when leaving. Compl. ¶ 31.[19] Plaintiffs have plausibly alleged that obtaining equipment and information is integral and indispensable to their principal activities. Defendant objects, rather, that Plaintiffs have not alleged the exchange involves more than a *de minimis* amount of time. Def.'s Mot. at 22.

As mentioned above, the parties dispute the standard for determining whether time is *de minimis*. Pls.' Opp. at 27–30; Def.'s Reply at 17–20. But even assuming that Defendant's statement of the legal standard is correct — a question I do not reach — Defendant's arguments are practically self-defeating, for they involve a complex array of factual questions about how long the exchange takes and the administrative difficulty of recording the time. Def.'s Mot. at 22–23. There is no way to resolve those questions in Defendant's favor on the pleadings alone.

## D. Other Issues

In addition to challenging Plaintiffs' allegations about uncompensated time, Defendant raises three other arguments — one directed at the FLSA claims as a whole, and two at aspects of the relief Plaintiffs seek.

Defendant argues that if Plaintiffs' claims as to any part of their pre- or post-shift time is dismissed, the Complaint must be dismissed in its entirety because "this Court would need to *speculate* to conclude that the remaining compensable time is more than *de minimis*." Def.'s Reply at 18. Because Plaintiffs no longer pursue their COVID-19 screening claim and their security screening claim must be dismissed, I consider whether the Complaint permits a plausible inference that the remaining activities are more than *de minimis*.

OPM has provided by regulation that periods of "preparatory or concluding activity" longer than 10 minutes are generally not *de mimimis*. 5 C.F.R. § 551.412(a)(1). (Although Defendant argues that some longer periods might be *de*

---

[19] Plaintiffs allege that time spent "exchanging information and equipment on the assigned post with oncoming staff" is "unpaid" at the Prison. Compl. ¶ 31. But Plaintiffs also appear to allege that while the incoming officer is not paid for the information exchange, the outgoing officer is. *Id.* ¶¶ 28–29. The potential contradiction need not be resolved on the pleadings.

*minimis* as well, *see, e.g.*, Def.'s Mot. at 6, I cannot reject Plaintiffs' claims on that basis without further factual development.) Plaintiffs allege that all the activities mentioned in the Complaint take approximately 15 to 30 minutes each day. Compl. ¶ 14; Pls.' Opp. at 29–30. Although the Complaint does not specifically address the subject, it is plausible that the two screenings take no more than 5 to 15 minutes, and that the remaining activities sometimes take 10 minutes or more — meaning that for at least *some* Plaintiffs on *some* days, the remaining activities take longer than the usual *de minimis* time. Contrary to Defendant's argument, that is not "speculat[ion]," Def.'s Reply at 18, but an application of "experience and common sense." *Iqbal*, 556 U.S. at 679.

Defendant next objects that Plaintiffs seek a "declaratory judgment" under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. *See* Compl. ¶ 1; Def.'s Mot. at 25–26. Plaintiffs present no argument in response. Defendant is correct: This Court lacks authority to issue declaratory judgments under the Declaratory Judgment Act, *see, e.g.*, *United States v. King*, 395 U.S. 1, 5 (1969), so any claims or requests for relief Plaintiffs seek under that theory must be dismissed for lack of jurisdiction under RCFC 12(b)(1).

Defendant finally moves to dismiss Plaintiffs' claims under the Back Pay Act ("BPA"), which authorizes attorneys' fees and prejudgment interest for federal employees who are "found by appropriate authority under applicable law … to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay, allowances, or differentials of the employee[.]" 5 U.S.C. § 5596(b)(1)(A), (b)(2); *see* Compl. ¶¶ 1, 46–47. Defendant argues that "[b]ecause plaintiffs fail to state an FLSA claim, their Back Pay Act claim must also be dismissed." Def.'s Reply at 20; *see also* Def.'s Mot. at 25. But the parties agree that the BPA may entitle Plaintiffs to additional damages if they prevail on their FLSA claim. *See* Def.'s Mot. at 25; Pls.' Opp. at 32–33; Def.'s Reply at 20.[20]

---

[20] The BPA "is merely derivative in application; it is not itself a jurisdictional statute," *United States v. Connolly*, 716 F.2d 882, 887 (Fed. Cir. 1983), and it is not money-mandating on its own, *see Semper v. United States*, 100 Fed. Cl. 621, 634 (2011). Rather, it becomes money-mandating "when based on violations of statutes or regulations covered by the Tucker Act." *Worthington v. United States*, 168 F.3d 24, 26 (Fed. Cir. 1999). When a federal employee is entitled to money because of violations of another law, the BPA mandates payment of additional money, and is therefore money-mandating in that contingent sense. *See Dustin v. United States*, 113 Fed. Cl. 366, 369 (2013) ("Acts of Congress and executive agency regulations which command or can be interpreted to command the payment of money are covered by the Tucker Act and thus trigger the Back Pay Act's money-mandating effect.").

Because aspects of Plaintiffs' FLSA claims will proceed, Plaintiffs retain their rights under the BPA.[21]

## **CONCLUSION**

In summary, Defendant's Motion to Dismiss is **GRANTED** as to Plaintiffs' claims (1) related to Plaintiffs' security and health screening, and (2) arising under the Declaratory Judgment Act. It is **DENIED** in all other respects.

The parties are **ORDERED** to submit a joint status report proposing further proceedings no later than **March 28, 2022**.


**IT IS SO ORDERED.**

s/ Stephen S. Schwartz
STEPHEN S. SCHWARTZ
Judge

---

[21] The nature and measure of compensation that might be available under the BPA involves separate questions that the parties have not raised, and which it would be premature to address at this early stage.